*869 P.2d 1339*

**TRUST CREATED UNDER the WILL OF Samuel M. DAMON, Deceased.**

**In the Matter of the ESTATE OF Samuel Mills DAMON, Deceased.**

**No. 16295.**

Supreme Court of Hawai'i.

March 30, 1994.

Carroll S. Taylor, of Taylor, Leong & Chee, Honolulu, for respondent-appellant Michael E. Haig.

Wayne Nasser, (Keith M. Yonamine, A. James Wriston, Jr. and M. Eleanor Herberg, with him on the briefs, of Ashford & Wriston), Honolulu, for respondent-appellant Joan Damon Haig.

Kenneth R. Kupchak, (Douglas C. Smith, C.F. Damon, Jr. of Damon Key Bocken Leong & Kupchak, and Frank T. Kanemitsu, Randall M.L. Yee and Richard L. Frunzi of Frunzi & Yee, with him on the briefs), Honolulu, Myron G. Sugarman, pro hac vice, of Cooley Godward Castro Huddleson & Tatum, San Francisco, CA, for respondents-appellees Heather Damon Sorenson, Arthur A. Henzell, Trustee for the Shawna Sorenson Trust, Douglas Philpotts, Trustee of the Heidi Snow Trust, Sharon M. Damon and John Philip Damon.

Benjamin M. Matsubara, (Jason M. Yoshida and Curtis T. Tabata, with him on the briefs, of Matsubara, Lee & Kotake), Honolulu, William M. McGovern, pro hac vice, Los Angeles, CA, for respondent-appellee Guardian Ad Litem for the Minor, Unborn, and Unascertained Beneficiaries of the Trust Created Under the Will of Samuel M. Damon, Deceased.

Mary Jane Connell, (Russell A. Ota and Duane R. Fisher, with her on the motions), Honolulu, for petitioners.

Before MOON, C.J., KLEIN, NAKAYAMA, JJ., BURNS, Intermediate Court of Appeals Chief Judge, in place of LEVINSON, J., recused, and ACOBA, Circuit Judge, in place of RAMIL, J., recused.

KLEIN, Justice.

The will of Samuel M. Damon created a trust to administer his estate which consisted of various business interests, considerable land holdings, including the Moanalua Gardens, and other assets. The will clearly provided for continuation of the trust throughout the lives of Damon's children and grandchildren who were living at the time of Damon's death (the measuring lives), but did not expressly refer to a termination date. Based on the language of the will and principles of construction, the trust is susceptible of two possible termination dates: (1) the date of the death of the last measuring life or (2) twenty-one years thereafter. Because only three of Damon's grandchildren who were living at his death are still living and are all over seventy years of age, the trustees filed a petition for instructions regarding the termination of the trust. The circuit court issued instructions to continue the trust for twenty-one years after the death of the last measuring life. For the reasons set forth below, we vacate the circuit court's order issuing instructions to continue the trust for twenty-one years after the death of the last measuring life and remand for issuance of instructions to terminate the trust upon the death of the last measuring life.

## I. *BACKGROUND*

The only evidence presented to the circuit court regarding the termination date of the trust was Damon's will itself; no extrinsic evidence was presented. The will, written in 1914 and admitted to probate following Damon's death in 1924, provided in part as follows:[1]

I DIRECT the payment of my just debts and funeral and testamentary expenses ...

I GIVE DEVISE AND BEQUEATH all of the rest residue and remainder of my property of every description nature or kind whatsoever or wheresoever the same may be unto [the trustees] in trust UPON TRUST

1. To hold the portion or portions of my real property at Moanalua ... to be used for the recreation and enjoyment of the public subject to such rules and regulations as my trustees shall think proper from time to time to impose provided however that ... the flowers fruit and other vegetable products of the said gardens shall during the life of my said wife be given to her and after her death to be given to such of my children as shall continue to live in equal shares ... and on the death of the last survivor of my said wife and children and said flowers fruit and other vegetable products shall fall into and form part of my residuary estate

2. In their discretion to carry on or join in carrying on any business now carried on by me alone or in partnership ... and I hereby authorize my said trustees to make arrangements with any partner or partners for the time being of Bishop & Company of Honolulu aforesaid Bankers of which I am a partner for the admission into the firm of any son or sons of mine ... and I declare that if my trustees should at any time find it disadvantageous or deem it unadvisable to carry on any of my said businesses ... then and in such case it shall be lawful for them absolutely to close and discontinue my said business ... and I direct that upon such determination or else upon the death of the last survivor of my children and grandchildren who shall be living at the time of my death my trustees shall sell collect and convert into money all of the assets and other effects of the said businesses and after paying thereout all debts and expenses owing and incurred for and on account of the same the residue shall form part of my residuary estate

3. To devote such portion of the net income of all of my residuary estate ... but not exceeding one-fourth part thereof to the maintenance ... of my real property at Moanalua aforesaid ...

4. To pay the balance of the said net income to my said wife during her life and on her death and for and during the period of the life of the last survivor of all of my children and grandchildren who shall be living at my decease to pay [the income to my issue per stirpes] And on the death of the last survivor of all of my children and grandchildren who shall be living at the time of my death my trustees shall hold all of my said property of every description nature or kind whatsoever and wheresoever the same may be IN TRUST for all of my issue who shall then be living per stirpes and not per capita

The circuit court felt that the provisions of the will indicated that Damon's intention was for the trust to continue beyond the death of the last measuring life. The court then ruled that because that construction of the trust created an ambiguity as to the time of termination, the principles set forth in *In re Estate of Hop*, 52 Haw. 40, 469 P.2d 183 (1970), required that the trust be reformed to continue as long as legally possible. The court accordingly issued instructions to terminate the trust twenty-one years after the death of the last measuring life. Two of the trust beneficiaries who participated in the circuit court proceedings now appeal from the circuit court's order contending that the circuit court erred in its construction of the will.

## II. *DISCUSSION*

■ The construction of a testamentary

---

1. The ten page will was written with virtually no punctuation.

trust[2] based solely on the will itself is a conclusion of law which we review under the right/wrong standard. *In re Estate of Holt*, 75 Haw. 224, 232, 857 P.2d 1355, 1359, *recon. denied*, —— Haw. ——, 863 P.2d 989 (1993).

### A.

When construing a testamentary trust we are guided by principles relating to the interpretation of trusts as well as those relating to the interpretation of wills. "A fundamental rule [when construing trusts] is that the intention of the settlor as expressed in a trust instrument shall prevail unless inconsistent with some positive rule of law. Moreover, in construing a trust document to determine the settlor's intent, the instrument must be read as a whole, not in fragments." *In re Trust of Lopez*, 64 Haw. 44, 49, 636 P.2d 731, 735 (1981) (citations omitted). Similarly, we have held that when interpreting wills, "no single word of [an] ambiguous clause should be literally interpreted as though standing alone. Each word, phrase, clause and sentence of the paragraph should be considered in relation to each other and the paragraph itself construed as a part of the will as a whole." *The Queen's Hospital v. Hite*, 38 Haw. 494, 505 (1950). Applying these principles, we believe that Damon intended that the trust terminate upon the death of the last measuring life.

The ambiguous language of the will is found in the last portion of the fourth numbered paragraph, which states:

> And on the death of the last survivor of all of my children and grandchildren who shall be living at the time of my death my trustees shall hold all of my said property of every description nature or kind whatsoever and wheresoever the same may be IN

TRUST for all of my issue who shall then be living per stirpes and not per capita[.]

The appellees argue that by directing that the property be held "IN TRUST," Damon manifested his intention that the trust continue beyond the death of the last measuring life. The mere use of the words "in trust," however, does not conclusively establish that Damon intended that the trust should continue. 1 George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* [hereinafter *Bogert* ] § 45 at 475 (rev.2d ed.1984) ("the use of words of trusteeship is not conclusive as to the expression of an intent to have a trust"). In *A.B. v. Wilmington Trust Co.*, 41 Del.Ch. 191, 191 A.2d 98 (1963), for example, a paragraph of an inter vivos trust provided that:

> In the event of the death of . . . Trustor, without any children her surviving, Trustees shall pay over the net income unto . . . husband of said Trustor, . . . and upon his death Trustees shall assign, transfer and pay over, absolutely and free and discharged from any Trust, the principal or corpus of said Trust Estate unto such person or persons [appointed in the Trustor's will], and in default of any such appointment, then *IN TRUST* to the nephews and nieces of said Trustor in equal shares, and their heirs, executors, administrators and assigns per stirpes.

41 Del.Ch. at 193, 191 A.2d at 99 (emphasis added). The court held that the use of the words "IN TRUST" in itself was insufficient to establish an intent to create a trust, and concluded that no trust was created because (1) there was nothing in the trust instrument setting forth the terms of any trust for the nephews and nieces, and (2) the preceding language unequivocally provided for an outright gift, free of any trust, if an appointee had been named in the Trustor's will.[3] *Id.* at 197, 191 A.2d at 101–02.

---

2. A testamentary trust is "[a] trust created by a will which takes effect only upon the testator's death. The trust must satisfy requirements of both a valid trust and a valid will." *Black's Law Dictionary* 1475 (6th ed.1991).

3. Similarly, in *Lopez*, the inter vivos trust at issue provided that:

> AND IT IS HEREBY further agreed and declared that after the death of the last surviv-

or of the [measuring lives], an undivided two-thirds of the said premises shall be held by the Trustee or his successors in trust.

> IN TRUST for all of the children of the [measuring lives] who shall be living at the time of the death of the last survivor of the [measuring lives] in equal shares if more than one.

64 Haw. at 47, 636 P.2d at 734 (emphasis omitted). Despite the use of the words "IN TRUST,"

In the instant case, although the ambiguous provision of Damon's will used the words "IN TRUST," there is nothing in the will setting forth trust terms for Damon's "issue who shall then[, on the death of the last measuring life,] be living." Moreover, examination of the will as a whole reveals several indicia of Damon's intent that belie the appellees' contention that Damon intended that the trust continue beyond the death of the last measuring life.

To begin with, the use of the "in trust" language in the ambiguous provision is different in form than the use of identical words in the preamble to the first numbered paragraph of the will. In both sections, Damon directs that all of his property, "whatsoever and wheresoever the same may be," be gathered and held "in trust" by the trustees. In the preamble to the first numbered paragraph, the "in trust" words are followed immediately by further directions that the property be disposed of "UPON TRUST" along with detailed instructions regarding the trustees' responsibilities and the distribution of trust income until the death of the last measuring life. These provisions clearly created a trust.[4] In the fourth numbered paragraph, on the other hand, the "IN TRUST" words are not followed by the "UPON TRUST" language, and no instructions are given regarding either the trustees' responsibilities or the manner of income distribution following the death of the last measuring life. The total lack of instructions to the trustees following the death of the last measuring life is especially glaring in light of the meticulous instructions they were to follow until that time.

In addition, Damon referred to the death of the last measuring life several times in his will.[5] Of particular significance is Damon's mandate to "sell collect and convert into money all of the assets and other effects" of his businesses no later than upon the death of the last measuring life. This "liquidation" of business assets is entirely consistent with a trustee's typical duties during the winding up of a trust that occurs when a trust terminates. *See* 18 *Bogert* § 1010 at 448–52 (rev.2d ed.1983).

Furthermore, Damon directed that upon the death of the last measuring life the property be held only for his "issue who shall then be living." On its face, that language limits the beneficiaries to persons alive at that time and excludes any issue born after the death of the last measuring life. *See Estate of Houston,* 491 Pa. 339, 421 A.2d 166 (1980) (holding that language in will directing distribution to "such of my grandchildren as may be living at the time of my death" unequivocally excluded afterborn grandchildren). By precisely defining the beneficiaries as those issue living at the time of the death of the last measuring life, placing no limits on the duration of their status as beneficiaries, and failing to specify any subsequent beneficiaries, Damon's instructions appear to direct transfer of the estate in trust for the specified beneficiaries absolutely. According to the Restatement (Second) of Trusts § 334 comment b (1959), when a "set-

we described the foregoing provision as "[t]he provision for the distribution of the trust corpus," accepting without discussion ·the trial court's conclusion that the trust for all of the children was a passive trust and that, "[a]ccordingly, the trust was to terminate on the death of [the last measuring life]." *Id.* at 47 & n. 3, 636 P.2d at 734 & n. 3.

4. The basic elements of a trust are:
   a person competent to create it, sufficient words to create it, a person capable of holding as trustee, a specified or ascertainable object, a definite subject, and a declaration of the terms of the trust.... [T]he terms—subject-matter, beneficiaries, etc.—must be so reasonably certain as to be capable of enforcement....
   *Kinney v. Robinson,* 30 Haw. 246, 253–54 (1927) (citations omitted). It is undisputed that the

provisions of Damon's will contained all of the elements necessary to create and maintain a trust until the death of the last measuring life.

5. In the second numbered paragraph, Damon directed that "upon such determination [that it would be disadvantageous or unadvisable to carry on any of his businesses] or else upon the death of the last [measuring life] my trustees shall sell collect and convert into money all of the assets and other effects of the said businesses[.]" Similarly, in the fourth numbered paragraph, when setting forth the manner of income distribution, Damon twice explicitly limited the distributions to the period during "the life of the last [measuring life]." Finally, the ambiguous provision at issue in this case applies "on the death of the last [measuring life]."

tlor transfers property in trust for one beneficiary for life and then in trust for another beneficiary absolutely, the inference is that the settlor intended the trust to be terminated on the death of the life beneficiary, although he does not state in specific words that the trust shall then terminate." *See also* 4 *Bogert* § 207 at 39 (repl. rev. 2d ed.1992) ("It seems obvious that . . . a trust transfer . . . 'in trust for' another, . . . without describing any duties to be performed by the trustee in carrying out the use or trust, creates a trust which is clearly passive and which is executed by a transfer of the trustee's interest to the beneficiary who thereafter holds as absolute owner.").

■ Finally, when a trust terminates, "the trust nevertheless continues for a reasonable time during which the trustee has power to perform such acts as are necessary to the winding up of the trust and the distribution of the trust property[.]" 18 *Bogert* § 1010 at 449–50. Given the size of Damon's estate, the trust will undoubtedly continue for a substantial time after termination during the winding up period. In light of the other indications that Damon intended that the trust terminate upon the death of the last measuring life, it is entirely plausible that the instruction to hold the property "IN TRUST" after that time merely referred to the inevitable continuation of the trust during the winding up period. Thus, viewing the will as a whole, we find strong indications that Damon intended that the trust terminate upon the death of the last measuring life.

## B.

■ Despite the various indications of Damon's intention that the trust terminate upon the death of the last measuring life, his instruction that the property be held "IN TRUST" leaves some doubt as to his actual intent. Even if we cannot conclusively determine that Damon intended that the trust terminate upon the death of the last measuring life, given the indicia that such was his intent, the most that can be said is that the language of the will is fairly open to more than one reasonable construction. The two constructions supported by the language of the will are that (1) Damon intended for the trust to continue indefinitely,[6] or (2) Damon intended that the trust terminate upon the death of the last measuring life. When there are multiple reasonable constructions, none of which can be said to more accurately reflect the settlor's intent, rules of law have developed to determine which of the constructions to adopt. One such rule states that a reasonable construction that will turn a provision "into an illegal perpetuity[ ] will not be preferred over [another] if such other upholds the validity of the provision consistently with the rule [against perpetuities]." *Queen's Hospital*, 38 Haw. at 506. In the instant case, construing the trust as continuing indefinitely would violate the Rule Against Perpetuities (RAP),[7] while construing it as terminating upon at the death of the last measuring life would not. Thus, we will not construe the ambiguous provision of Damon's will as creating a trust to continue indefinitely.[8]

■ The appellees also argue that the will could be construed as creating a trust

---

6. Although no termination date is provided if the will is interpreted as creating a trust to continue beyond the death of the last measuring life, because the only beneficiaries of such a continuing trust would be limited to Damon's issue who are living at the time of the death of the last measuring life, the trust would necessarily terminate upon the death of the last survivor of those issue. Because the length of the lives of those issue are indeterminable and could last far in excess of twenty-one years, a trust to continue until the death of the last survivor of Damon's issue who are living at the time of the death of the last measuring life is essentially a trust to continue indefinitely.

7. The RAP applicable in the instant case is the common law RAP. and not the statutory RAP adopted as chapter 525 of the Hawai'i Revised Statutes in 1992. *Holt*, 75 Haw. at 232 & n. 3, 857 P.2d at 1359 & n. 3. The common law RAP provides that "no interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest." *Id.* (quoting *In re Estate of Hop*, 52 Haw. 40, 42 n. 3, 469 P.2d 183, 185 n. 3 (1970)).

8. Because we reject the construction of the trust that would violate the RAP we do not reach any issues concerning the application of the doctrine of equitable approximation set forth in *Hop*.

intended to continue "as long as legally possible." Because such a construction would not violate the RAP, *Fitchie v. Brown*, 18 Haw. 52 (1906), *aff'd*, 211 U.S. 321, 29 S.Ct. 106, 53 L.Ed. 202 (1908); *see also Holt*, the *Queen's Hospital* rule would not apply to establish a preference in favor of termination of the trust upon the death of the last measuring life. In order for that construction to merit consideration, however, it must be determined to be a reasonable construction of the will. The appellees contend that when Damon wrote his will in 1914, eight years after this court held in *Fitchie* that a testamentary trust that was to continue "for as long a period as is legally possible" did not violate the RAP, he may have believed that in the absence of a specific termination date the court would automatically allow the trust to continue as long as legally possible. This contention, however, is purely speculative and not based on any language contained in the will. Because we "are to gather from the words [of the will] the intention of the testator, and to gather it not by speculation or conjecture as to what the testator may have intended, but by a sound and reasonable construction of the words which he has used," *Fitchie*, 18 Haw. at 70 (citation omitted), a construction of the will requiring us to find that Damon intended for the trust to continue "as long as legally possible" cannot be considered a reasonable construction.

## III. *CONCLUSION*

Based on our examination of Damon's will as whole and the application of established rules of law, we conclude that the trust must terminate upon the death of the last measuring life. Therefore, we vacate the circuit court's order issuing instructions to continue the trust for twenty-one years after the death of the last measuring life and remand for issuance of instructions to terminate the trust upon the death of the last measuring life.